STEWARD *v.* TRAVERSE CITY STATE BANK.

1. TRUSTS —MORTGAGES —ACCOUNTING —DEBTOR AND CREDITOR — NEGLIGENCE.

  Where one of two partners engaged in the manufacture of lumber products executed a note to defendant bank in order to obtain money to cover a shortage in public funds controlled by him, and also executed a mortgage upon his partnership and other property to an officer of the creditor, agree-

ing that the creditor or its officer should have the right to take possession of the real and personal property conveyed but not of the lumbering business, if at any time they deemed themselves insecure, and where the said officer thereafter took possession of the lumbering business, with the knowledge and consent of the debtor, leaving the partner in control as manager, the relation between the creditor's representative and the debtor was that of trustee and beneficiary and in the conduct of the business the trustee owed the duty to exercise ordinary care and prudence to avoid losses, overcharges, and unreasonable expenditures.

2. SAME.

It was error, in an accounting in equity, to charge the creditor or its representative with the value of any of the property employed in the business on the theory that it was wrongfully appropriated, under a bill of complaint framed on the theory that complainant was entitled to an accounting for the profits of the business and to have them applied in reduction of complainant's debt, and containing no averment that complainant gave no authority to take possession of the business.

Appeal from Grand Traverse; Mayne, J. Submitted June 26, 1911. (Docket No. 62.) Decided January 23, 1912.

Bill by George W. Steward against the Traverse City State Bank, Samuel Garland, executor of the estate of Julius T. Hannah, deceased, and Elsie R. Hannah, as executrix thereof, for an accounting. From a decree for complainant, defendants appeal. Reversed and remanded for further proofs.

*Covell & Cross*, for complainant.

*Pratt & Davis* and *Parm C. Gilbert*, for defendants.

Complainant executed and delivered an instrument, reading:

"$6,000.00.
"TRAVERSE CITY, MICH., Oct. 17, 1904.
"On demand after date, I promise to pay to the order of Traverse City State Bank six thousand and no-100 dollars, at the Traverse City State Bank, for value received,

with interest at the rate of seven per cent. per annum after date. Having deposited and pledged with Julius T. Hannah as collateral security for the payment of this note, and any other indebtedness due and to become due from me to said Traverse City State Bank, its assigns, property at 422 West Eleventh street, 433 West Seventh street, 256 East Ninth street, lot 14, block 16, city of Traverse City, Mich., also W. fract. 1-2 of N. W. fract. 1-4 Sec. 6, Tp. 25 N. R. 10 West, and certain lands in So. Boardman and Wilson Tp., and bill of sale of all personal property in Boardman Tp., title held by J. T. Hannah as collateral for this note.

" I hereby authorize the sale of said security at public or private sale or otherwise, and with or without notice, on the nonperformance of these promises and said Traverse City State Bank or Julius T. Hannah may become the purchaser thereof, and it is hereby agreed that if the said security, in the opinion of said Julius T. Hannah, shall depreciate in value, said Julius T. Hannah may elect without notice that this obligation is due and payable on demand.

" It is further agreed that the said Traverse City State Bank or Julius T. Hannah shall have a right to hold and apply, at any time, on my own indebtedness or liability to the maker hereof, as security for the payment of any liability due or to become due from the maker hereof.

"GEORGE W. STEWARD."

He also executed and delivered to Julius T. Hannah conveyances of real estate and a bill of sale of certain personal property, all as indicated in said written instrument. The form of the said conveyances imported the transfer of title to all of the property to said Hannah. The deeds of real estate were recorded. Before he died, which was November 25, 1905, Mr. Hannah sold portions of the said real estate and personal property. After his death, his executors, one or both acting in that behalf, sold other of the real estate and personal property. Certain rents were received by or for the said Hannah or by his executors, and some of the property so conveyed as security has not been disposed of. Some time in December, 1906, or January, 1907, complainant filed his bill of complaint against said executors and the Traverse City

State Bank, charging among other things, that, at the time the said promissory note was executed and the said security for its payment was given, complainant was engaged in lumbering certain of the said lands in Kalkaska county and in manufacturing lumber and shingles from the timber thereon; that Julius T. Hannah at once, or soon, took exclusive control of such operations; that after his death the operations were continued by his executor, Garland; that they cut, removed, manufactured, and sold quantities of lumber and shingles and sawlogs, the profits of which operations ought to be credited to complainant, and when credited would extinguish the said indebtedness and show a balance due to complainant. An accounting was prayed for. Issue was joined, proofs taken, and a decree was entered August 26, 1909 (which is also a statement of the account), requiring the defendants to pay to complainant the sum of $4,110.87, with interest and costs, and to convey certain of the property remaining undisposed of.

The court found:

" That during the fall of 1904, complainant George W. Steward and one George Payn were engaged in the manufacture of lumber and shingles at Crofton, in the county of Kalkaska and State of Michigan; that the arrangements between Steward and Payn would probably amount to partnership, and Payn was the manager and had personal supervision of the business; that the title to the real estate from which the timber was taken was in complainant, he having furnished the money with which it was purchased, and also the money to carry on the lumbering operations; that Steward and Payn had an open account with the Hannah & Lay Mercantile Company, of Traverse City, Mich., for supplies furnished to them; that Julius T. Hannah was interested in the Hannah & Lay Mercantile Company and was also in the Traverse City State Bank; that on October 17, 1904, complainant, Steward, being in need of money for his individual use, made a loan with the Traverse City State Bank; Julius T. Hannah, who was an officer of the bank, negotiating the same; that to secure the payment of said loan, complainant, Steward, gave his note for $6,000, with interest

at the rate of 7 per cent. per annum, to the Traverse City State Bank, and transferred to Julius T. Hannah the several parcels of real estate described in the bill of complaint in this cause, including the timbered lands in Kalkaska county then being operated by Steward and Payn, also the manufactured products then on hand, consisting of logs, lumber, and shingles, also teams, tools, etc., used in carrying on the lumbering operations. No change was made in the Steward & Payn contracts, and no settlement of the partnership matter was had. That the purpose of the transfer of the real estate and personal property from complainant to Julius T. Hannah was to secure the payment of said $6,000 note and any other indebtedness due or to become due from complainant to the said Traverse City State Bank. That by the terms of said note Julius T. Hannah was given the right, upon deeming himself insecure, to take possession of the real estate and personal property, to sell the same at public auction or private sale. Also, he was given the right to buy the same in his own name or the name of the Traverse City State Bank. That no authority was given Julius T. Hannah to take possession of the lumbering operations and continue the business. That Steward & Payn remained in possession of the lumbering business and continued to manufacture lumber and shingles until March 20, 1905. That Julius T. Hannah sold certain of the real estate at different times, and on March 20, 1905, took possession of all the property and turned the lumbering operations over to Payn, who thereafter carried it on for Julius T. Hannah. That complainant, Steward, had no control of the property or business after March 20, 1905. Payn continued operations, manufactured shingles, lumber, posts, and other forest products; Hannah advancing the money to him to enable him to carry on the business. That under the terms of the conveyance of the real estate and personal property, Hannah had no authority to continue the business, and the complainant is not responsible for losses that were sustained after March 20, 1905. That in taking possession of the goods and handling them as he did, Hannah, if he did not actually sell the goods and buy them, as provided by the contract between himself and Steward, in effect, by taking possession and operating the business, he did so. That on the 25th day of November, 1905, Julius T. Hannah died, leaving a last will and testament, wherein he appointed Samuel Garland and Elsie

R. Hannah his executor and executrix, and that thereafter said executors sold certain of the real estate, timber, and personal property which had been transferred by complainant to said Julius T. Hannah as security for the payment of said indebtedness, and that there is certain of said real estate yet remaining undisposed of."

The account is stated upon the basis:

"That the complainant should be debited with the indebtedness due from Steward & Payn to the Hannah & Lay Mercantile Company and unpaid on October 17, 1904; also, the taxes, insurance and other legitimate expenditures in relation to the real estate; also, all amounts furnished or advanced by Julius T. Hannah for the purpose of carrying on the lumbering operations up to and including March 20, 1905. That the complainant should be credited with the rents and the moneys received from the sale of lumber, shingles, received from the real estate, the money received by Julius T. Hannah from the sale of real estate during his lifetime, and other forest products and personal property previous to March 20, 1905. That the complainant is also entitled to credit for the actual cash value of logs, lumber, shingles, and other forest products and personal property, possession of which was taken by Julius T. Hannah on March 20, 1905; also, the actual cash value of all real estate, timber, and personal property sold by the executors after the death of Julius T. Hannah."

Both parties claimed to have appealed, although defendants say that complainant has not properly done so. In the brief for complainant it is said:

"It is claimed by the defendants that, in addition to being given credit for the face of the note and interest thereon, they should also be given credit for all moneys advanced by Mr. Hannah to Payn, irrespective of the use which Payn made of such money; that they should also be credited with the amount of merchandise claimed to have been shipped to Crofton upon orders from Payn, and O. K.'d by Hannah, including a balance due to the Hannah & Lay Mercantile Company, from Seward at the time the transfer of the property was made, and that the complainant should bear whatever loss was sustained in the lumbering operations, whether such loss resulted from the mismanagement or dishonesty of Payn, or from other causes. The complainant contends that the trust created

by the terms of the note, and the transfer of the property
to Hannah, merely authorized Hannah to sell the property
and apply the proceeds to the satisfaction of the note, and
did not authorize him to continue the lumbering opera-
tions; and that the defendants should be charged with
the actual value of the property received, irrespective of
the result of the lumbering operations. The complainant
further contends that, even though Mr. Hannah was
authorized to continue the lumbering operations, he was
guilty of such gross negligence in looking after the matter
that he should be held responsible for the actual value of
the property, irrespective of the results of the lumbering
operations. The complainant also contends that the cir-
cuit judge was in error in determining that Mr. Hannah
did not take possession of the personal property until
March 20, 1905, but that it should be found, as a matter
of fact, that Mr. Hannah took possession of all of. the
property on October 17, 1904, and should be required to
account for such property as of that date. No question
is raised by the complainant in regard to the prices at
which the various parcels of the real estate were sold by
Mr. Hannah during his lifetime, and practically the en-
tire controversy centers upon the question of the right of
Hannah to carry on these lumbering operations during
his lifetime, and the right of his executors to continue
such operations after his decease."

For defendants, it is asserted that complainant had
knowledge of the lumbering operations and of the applica-
tion of all moneys received on account of them; that:

" Complainant filed his bill of complaint referring to all
these transactions and asking in the numerous paragraphs
of such bill that the moneys received by Julius T. Hannah
and the Traverse City State Bank, and later the executors
of Julius T. Hannah, deceased, should be accounted for
as trust funds. The defendants met this bill by saying
that they were ready to account for all moneys received,
and the defendants' statement summarized is found in
their answer. The total amount received, as shown by
this statement, is $14,949.73. The cash paid out for sup-
plies, later, and operating expenses was $10,384.49. The
balance, $4,565.24, was applied on the note. The amount
of the note was $6,000, beside interest. These figures in-
clude all the operating expenses except a few items that
will be referred to in the argument, and leave a balance

owing by complainant at the commencement of this suit, according to this statement, of about $1,500. There is no claim in the bill of complaint that defendants wrongfully disposed of or used the property in any way, nor any claim that complainant did not know of all the operations substantially as they occurred; but, on the contrary, the bill of complaint was drawn on the theory that such moneys as had been actually received and resulting from the operations should be treated as trust funds, the only inquiry being how much those proceeds amounted to."

They ask that the decree rendered be reversed, that the court enforce the rule that, "where a beneficiary either expressly or impliedly assents to the action of his trustee in managing his property not in strict accord with the terms of the trust, he will be held to have acquiesced in such action," and that a decree be entered for defendants (they having asked for affirmative relief) for $1,288.19. Incidental to this, the main contentions of the parties are certain questions concerning the admissibility of testimony.

OSTRANDER, J. (*after stating the facts*). It is apparent that in the court below, and in this court, the real differences of the parties concern the actual and legal relation of Mr. Hannah and his executors to the property embarked in, and the product of the lumbering and manufacturing operations carried on by complainant and his partner, Payn, and afterwards by Mr. Hannah and his representatives. To understand this relation, some reference must be made to the testimony. That establishes, I think, the following facts: The debt evidenced by the note of complainant which is above set out was not, in its inception, the ordinary debt created by the lending of money. Complainant was a public officer, and Mr. Hannah was his surety, or was one of his sureties. A discrepancy, or shortage, in his accounts was made good by Mr. Hannah. The note represents the whole or a part of this sum, and the security given was, as we infer from the record, such as complainant could furnish. The Kalkaska

lands were then being lumbered by complainant and one George Payn, who had made various contracts with various persons for the putting in of logs, the hauling of cordwood, and the manufacture of the logs into lumber and shingles. The sale of the manufactured products had been arranged for, and credit had already been extended to Steward & Payn on account of the operations, and in turn they had advanced to contractors money so that some of them were indebted to the firm. Roads had been built from the land to the place where the logs were to be delivered for manufacture. Mr. Payn had an interest in the land (the title being held by complainant) and in the proceeds of the lumbering operations and had principal charge of the business of Steward & Payn, or Payn & Steward, so being carried on. Matters were in this condition when complainant proposed those lands and the personal property used thereon in conducting the logging operations, and the logs and lumber already cut, as security for his debt. Mr. Hannah consulted with Mr. Payn, and so did complainant. Payn agreed that he would consent to the proposal if he could continue in charge of the work. I do not know just what Payn's interest was; but it is clear that both complainant and Hannah considered that he had an interest, and that his consent should be secured.

That complainant understood that the lumbering and manufacturing were to be continued is, in my judgment, made clear, and that he participated therein, after turning the property over to Mr. Hannah, is equally clear. I find that the understanding was mutual. I do not perceive any legal objection to the arrangement; all parties in interest consenting thereto. It is true the property was turned out as security for a debt, and Mr. Hannah was empowered to sell it. But I do not understand how complainant can now object to the legality of the further arrangement according to which the personal property, such as horses and equipage, was continued in the service in which it was already engaged, or by what right he may now complain that instead of selling the property, includ-

ing the land, thus interrupting all contracts which had been made by Steward & Payn, the timber was manufactured as he agreed it should be. The business was carried on, under the arrangement, from October until March. Of this fact there can be no doubt. It was thereafter continued, without any protest or demand on the part of complainant. Mr. Hannah had as much and the same authority to continue the business after March, 1905, as before that time. That complainant had little, if anything, to do with the business after March, 1905, is not a fact of any importance. That Mr. Hannah declined to proceed with the business if it was to be managed by complainant, or if he was to be employed at wages, is a fact easily accounted for. The understanding from the beginning was that Payn, and not complainant, should be manager, and to this complainant assented. The bill of complaint was filed long afterwards. It is framed according to the theory that complainant is entitled to an accounting and to have the fair and reasonable profits arising from the business applied in reduction of his debt. It is not intimated therein that authority to carry on the business had not been given. Complainant took the chances of a profit to be produced by Payn's management, to which he expressly agreed, and Hannah's capital, which he knew was being used. He never protested, never demanded, and never was refused, information. I am of opinion that in so far as the account is stated according to the theory that any of the defendants should be charged, on March 20, 1905, or on any other day, with appropriating any of the property, or with dealing with it without authority, it is wrongly stated.

It does not follow, however, that Mr. Hannah had the right to exercise no care, or indifferent care, with respect to the enterprise. The agreement that Payn should manage the business did not relieve Mr. Hannah from all responsibility. His advances of cash and of merchandise were items of the cost of running the business, to be repaid before a profit would be shown. He was under some

obligation to see to it that disbursements were properly made; that accounts were properly kept. It appears that he gave the matter little or no attention, but advanced cash and merchandise, upon the demand of Payn, without supervision and with little inquiry. Probably no one may be truthfully charged with dishonesty. Yet it is clear that Payn permitted Harrington, who boarded some of his men, to be constantly and increasingly overpaid, when the exercise of ordinary business sense would have prevented such a result. Complainant should not be charged with such a loss. As to the amount of the indebtedness of certain contractors who were overpaid, the conclusion, upon this record, cannot be so certain. Their accounts were not closed when Hannah took over the property, and it seems that then they had been, to some extent, overpaid. But the testimony tends strongly to show that ordinary business prudence would have prevented further considerable overpayments. Taking over this business, as Mr. Hannah did, at the stage to which it had then been brought, continuing it after the manner in which it had theretofore been conducted, without changing or revoking contracts already made by complainant, Mr. Hannah did not insure the success of the business or agree that it should show a profit. In so far as losses can be traced to his failure, or to the failure of his representatives, to exercise ordinary care and prudence in conducting the business as it was conducted, they should be borne by defendants. It is impracticable for this court to state an account in accordance with the indicated rule.

The decree will be reversed, and the record remanded for that purpose. Neither party will recover costs of this appeal as against the other, and, inasmuch as both claim to have appealed from the decree, the cost of preparing and printing the record, exclusive of counsel's fees therefor, will be equally divided.

Moore, C. J., and Brooke, Stone, and Bird, JJ., concurred.